UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------------x
GERALD ROBERTS, STEPHEN JOHNSON,                :
CHRISTOPHER MCLEOD, DAVID SHAW, ANITA          :
JOHNSON, CHRISTOPHER HUMPHRIES, JEFFREY  :
WILKINS, LATANYA MARTIN-RICE, LAURA             :        MEMORANDUM &
SANCHEZ, LUCY MUNOZ, NATALIO HERRERA,          :        ORDER
RADIKA KANHAI, ROGER SIERRA, YOO SUNG         :        14-CV-257 (ILG) (VMS)
KIM, CHRISTINA LAMBRU, IRENE TSOROROS,         :
MARIA DIAZ, CYNTHIA DURAN, JASPER JONES,       :
ALLEN CHERFILS, LISA LUNDSREN, TERESA          :
AREVALO, SYED A. HAQUE, AHMED TALHA,           :
OLIE AHMED, JAMAL AHMED, SORWAR                :
HUSSAIN, LUZ OSPINA, JOHNNY MURILLO,           :
THOMAS DORGAN, SENECA SCOTT, ERIC LEE,         :
WILLIAM BOONE, MARLENNI MINAYA, ISABEL         :
PENA, CELESTE BROWN-POLITE, DWIGHT             :
CURRY, RAWLO BENFIELD, JOSEPH BROWN,           :
SANDRA MILENA-MARTINEZ, MARINO CANO,           :
ABIGAIL APPIAH-OTCHERE, DALIA TOPPIN, ANA :
MOREIRA, BETSABE TORRES, LORNA BENT,           :
OSMOND WALKER, CONRAD HALL, VISHWANI          :
SUKHRAM, ANNE GRONATA, BRUCE SMITH,            :
NESTOR AMAYA, GUIDO ANTONIO RODRIGUEZ,  :
WILLIE BALLENTINE, PETER VONTAS, FELIX         :
GONZALEZ, MICHELLE LATIMER, VARISE             :
WALLER, SOOKIA FREEMAN, CAMARCA                :
FLOWERS, ANTONIO SALCEDO, JOEVEN CORTEZ,:
and JUDITH ALLEN, on behalf of themselves and all  :
others similarly situated,                                          :
                                                                               :
                                    Plaintiffs,                         :
                                                                               :
        -against-                                                        :
                                                                               :
GENTING NEW YORK LLC, d/b/a RESORTS          :
WORLD CASINO NEW YORK CITY,                     :
                                                                               :
                                    Defendant.                       :
----------------------------------------------------------------------x
GLASSER, Senior United States District Judge:

On January 14, 2014, plaintiffs Gerald Roberts, Stephen Johnson, Christopher McLeod,

and David Shaw, on behalf of themselves and all others similarly situated, commenced this action

against defendant Genting New York LLC, d/b/a Resorts World Casino New York City ("Resorts World"), alleging violations of the Worker Adjustment and Retraining Notification Act ("WARN Act"), 29 U.S.C. §§ 2101, *et seq.*, and New York Labor Law ("NYLL") §§ 860, *et seq.* ("N.Y. WARN Act").  Compl. ¶ 1, Dkt. 1.  On March 17, 2014, plaintiffs filed an Amended Complaint, adding 59 new plaintiffs.  Am. Compl., Dkt. 5.  Before the Court are the parties' cross motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  Dkt. 53, 61.  For the reasons set forth below, plaintiffs' motion for summary judgment is DENIED and Resorts World's cross motion for summary judgment is GRANTED.

## BACKGROUND

### I.      Statutory and Regulatory Framework

Congress enacted the federal WARN Act to protect workers, their families, and communities by requiring employers to provide advance notice before plant closings and mass layoffs.  20 C.F.R. § 639.1(a).  Such advance notice "provides workers and their families some transition time to adjust to the prospective loss of employment, to seek and obtain alternative jobs and, if necessary, to enter skill training or retraining that will allow these workers to successfully compete in the job market."  *Id.*; *see Guippone v. BH S & B Holdings LLC*, No. 09-CV-1029 (CM), 2010 WL 2077189, at *2 (S.D.N.Y. May 18, 2010), *aff'd*, 737 F.3d 221 (2d Cir. 2013).

A business enterprise with 100 or more full time employees qualifies as an "employer" under the federal WARN Act.  29 U.S.C. § 2101(a)(1)(A).  An employer must provide a 60-day written notice to each affected employee or their representative before a plant closing or mass layoff.  29 U.S.C. § 2102(a)(1).  If an employer orders a plant closing or mass layoff without giving the required notice, the employer is liable to each affected employee for back pay and benefits for the period of the violation, up to a maximum of 60 days, but in no event for more than one-half

the number of days the employee was employed by the employer.  29 U.S.C. § 2104(a)(1).  A

"plant closing" means "the permanent or temporary shutdown of a single site of employment, or

one or more facilities *or operating units* within a single site of employment, if the shutdown results

in an employment loss at the single site of employment during any 30-day period for 50 or more

employees excluding any part-time employees."  29 U.S.C. § 2101(a)(2) (emphasis added).

The regulations define an "operating unit" for purposes of the WARN Act as "an

organizationally or operationally distinct product, operation, or specific work function within or

across facilities at a single site."  20 C.F.R. § 639.3(j).  The Department of Labor ("DOL"), when

promulgating these regulations, explained that "[t]he reason for the use of the term 'operating unit'

in WARN is to apply the protections of the law to small units of workers in a larger plant when

their units are closed."  Analysis of Final Rule and Comments to Section 639.3(j), 54 Fed. Reg.

16051 (1989).  Indeed, the DOL stated, "[i]t is not relevant to this purpose whether the workers

are production workers or support workers; their job loss and their need for protection is as real in

either case."  *Id.*  The DOL further explained that "[t]he critical factor in determining what

constitutes an operating unit will be the organizational or operational structure of the single site of

employment" and that "[s]ources of evidence which will assist in defining separate and distinct

units will be applicable collective bargaining agreements, the employer's organizational structure

and industry understandings of what constitutes distinct work functions."  54 Fed. Reg. 16050.

The N.Y. WARN Act is similar to the federal WARN Act, with several key differences.

First, the N.Y. WARN Act "sets a lower trigger threshold for its protections."  *1199 SEIU United*

*Healthcare Workers E. v. S. Bronx Mental Health Council, Inc.*, No. 13-CV-2768 (JGK)(JCF),

2013 WL 6003731, at *2 (S.D.N.Y. Nov. 13, 2013), *report and recommendation adopted*, 2013

WL 6244716 (S.D.N.Y. Dec. 3, 2013).  Specifically, an "employer" is defined as a business

enterprise with 50 or more full time employees, as opposed to 100 or more, and a "plant closing" is defined as the permanent or temporary shutdown of a single site of employment, or one or more facilities or operating units within a single site of employment, if the shutdown results in an employment loss during any 30-day period for 25 or more full time employees, as opposed to 50 or more.  NYLL § 860-a(3), (6).  Next, the notification requirements under the N.Y. WARN Act are stricter, requiring an employer to provide a 90-day written notice—as opposed to a 60-day notice—to each affected employee and their representative before a plant closing or mass layoff. NYLL § 860-b(1).  "Given these stricter requirements, wherever there is liability under the federal WARN Act, there is necessarily liability under the N.Y. WARN Act."  *1199 SEIU United Healthcare Workers E.*, 2013 WL 6003731, at *2.

## II.     Facts and Procedural History[1]

Resorts World operates a casino in Queens, New York that offers thousands of games and a variety of food and beverage options.  Def.'s Rule 56.1 Statement of Undisputed Material Facts ("SOF") ¶¶ 1, 3, Dkt. 65; Pls.' Response to Def.'s Rule 56.1 SOF ¶¶ 1, 3, Dkt. 68.  In or around July 2010, prior to the opening of the casino in 2011, the New York Hotel and Motel Trades Council, AFL-CIO (the "Union") began to organize Resorts World's future non-management employees.  Def.'s Rule 56.1 SOF ¶ 7; Pls.' Response to Def.'s Rule 56.1 SOF ¶ 7.  In this regard, the Union and Resorts World entered into a card check and neutrality agreement (the "Neutrality Agreement"), which designated an "Interest Arbitrator" to preside over all matters between the Union and Resorts World.  Def.'s Rule 56.1 SOF ¶¶ 7–8; Pls.' Response to Def.'s Rule 56.1 SOF ¶¶ 7–8; *see* Neutrality Agreement, Dkt. 63-2.  On December 20, 2011, the Interest Arbitrator—the Office of the Impartial Chairperson—certified that the Union had obtained a majority of the cards

---

[1] Unless otherwise noted, plaintiffs do not dispute the facts as set forth in this section except to object as "not material."

selecting the Union as the exclusive bargaining representative for all non-management job classifications.  Def.'s Rule 56.1 SOF ¶ 8; Pls.' Response to Def.'s Rule 56.1 SOF ¶ 8; *see* Certification of Card Count, Dkt. 63-3.  Plaintiffs were members of the Union at all times relevant to this action.  *See* Def.'s Mem. of Law in Supp. of Mot. for Summ. J. ("Def.'s Mem. of Law") at 4, n.2, Dkt. 64.

On October 18, 2013, the Interest Arbitrator issued an award, which resolved certain unsettled terms in the Collective Bargaining Agreement ("CBA"), including, as relevant here, employee hourly and weekly wage rates, as well as a schedule of annual wage increases, and increases in pension and health benefits and vacation, holiday, and sick leave.  Def.'s Rule 56.1 SOF ¶ 9; Pls.' Response to Def.'s Rule 56.1 SOF ¶ 9; *see* Interest Arbitration Award, Dkt. 63-4, 63-5, 63-6.  This Interest Arbitration Award, which became effective immediately, "nearly doubled employee wages for Union members, and increased Union members' health and pension benefits by more than 20 percent."  Def.'s Rule 56.1 SOF ¶ 10; Pls.' Response to Def.'s Rule 56.1 SOF ¶ 10.  Resorts World claims that it was forced to mitigate "the extraordinary impact" of the Interest Arbitration Award by, among other things, reducing the workforce.  Def.'s Rule 56.1 SOF ¶ 12; Pls.' Response to Def.'s Rule 56.1 SOF ¶ 12.

Furthermore, Resorts World claims that, from approximately November 2013 through the first week of January 2014, it had negotiated with the Union in meetings and by email concerning proposed non-management layoffs.  Def.'s Rule 56.1 SOF ¶¶ 14–15; *see* Emails, Dkt. 63-7.  Plaintiffs counter that the proposed "layoffs were more of a decree by [Resorts World] which the Union had no choice but to agree with in significant portion."  Pls.' Response to Def.'s Rule 56.1 SOF ¶¶ 14–15.

On January 6, 2014, Resorts World closed the Aqueduct Buffet—one of the food outlets at the casino—and terminated approximately 177 employees, including cooks, food servers, food runners, bussers, hosts, cashiers, warehouse attendants, and stewards.  Def.'s Rule 56.1 SOF ¶ 18; Pls.' Response to Def.'s Rule 56.1 SOF ¶ 18; Pls.' Rule 56.1 SOF ¶ 1, Dkt. 56; Def.'s Response to Pls.' Rule 56.1 SOF ¶ 1, Dkt. 59; *see* Not. of Layoffs dated Jan. 6, 2014 & FAQ, Dkt. 63-8; List of Layoffs, Dkt. 63-9.  Resorts World contends that, "at the time they were laid off, some of the affected employees were working in the Aqueduct Buffet, while others were working in other outlets/departments of Resorts World, such as the Stewarding department, the Cold Kitchen and the Warehouse."   Def.'s Rule 56.1 SOF ¶ 19; Pls.' Response to Def.'s Rule 56.1 SOF ¶ 19.  "In fact," Resorts World asserts, "nearly half (71) of the affected employees did not work in the Aqueduct Buffet either exclusively, consistently or at all."  Def.'s Rule 56.1 SOF ¶ 19 (emphasis omitted); Pls.' Response to Def.'s Rule 56.1 SOF ¶ 19.  Laid-off employees received "Regular Severance," as well as other required payments, and approximately 20 laid-off employees received "Enhanced Severance," which included a waiver of claims against Resorts World.  Def.'s Rule 56.1 SOF ¶ 20; Pls.' Response to Def.'s Rule 56.1 SOF ¶ 20 (disputing, among other things, that the exchange included a general waiver); *see* CBA, Dkt. 63-10; Severance Info., Dkt. 63-11.

Plaintiffs brought the instant action, asserting that they did not receive advance notice of the closure in violation of the federal WARN Act and N.Y. WARN Act.  Am. Compl. ¶¶ 160–65.  On February 16, 2016, the parties filed their cross motions for summary judgment.  Not. of Pls.' Mot. for Summ. J., Dkt 53; Pls.' Mem. of Law in Supp. of Mot. for Summ. J. ("Pls.' Mem. of Law"), Dkt. 55; Not. of Def.'s Mot. for Summ. J., Dkt. 61; Def.'s Mem. of Law.[2]  On December

---

[2] On February 21, 2018, the case was reassigned from U.S. Senior District Judge Sandra L. Townes to the undersigned.

11, 2020, the Court heard oral argument on the cross motions and reserved decision.  Min. Entry

dated Dec. 11, 2020, Dkt. 75.

## DISCUSSION

### I.    Legal Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex

Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (internal quotation marks omitted); *see* Fed. R. Civ. P.

56; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986).  "An

issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for

the nonmoving party.'"  *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002) (quoting *Anderson v.

Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A fact is material when it "might affect the

outcome of the suit under the governing law." *Id.* (quoting *Anderson*, 477 U.S. at 248).

If the movant satisfies its initial burden of production, the burden of proof shifts to the non-

moving party, who "must come forward with specific facts showing that there is a genuine issue

for trial." *Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 587 (internal quotation marks, emphasis,

and citation omitted).  Once the non-movant has met that requirement, its "allegations [will be]

taken as true, and [it] will receive the benefit of the doubt when [its] assertions conflict with those

of the movant." *Samuels v. Mockry*, 77 F.3d 34, 36 (2d Cir. 1996) (internal quotation marks and

citation omitted).

The Court's role in a motion for summary judgment is one of "issue-finding," not "issue-

resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).

"In determining whether summary judgment is appropriate, this Court will construe the facts in

the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (internal quotation marks and citation omitted). "The same standard[s] appl[y] where, as here, the parties file[] cross-motions for summary judgment." *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001). "[W]hen both parties move for summary judgment, asserting the absence of any genuine issue[] of material fact, a court need not enter judgment for either party." *Id.* "Rather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Id.*

## II.   The Aqueduct Buffet was not an operating unit.

Plaintiffs argue that, because the closure of the Aqueduct Buffet qualifies as a "plant closing" under the federal WARN Act and N.Y. WARN Act, Resorts World was required to send an advance notice of the closure to plaintiffs.  Pls.' Mem. of Law at 4–6.  A "plant closing," as stated above, is defined as "the permanent or temporary shutdown of a single site of employment, or one or more facilities or *operating units* within a single site of employment."  29 U.S.C. § 2101(a)(2) (emphasis added); NYLL § 860-a(6).  The main issue in the cross motions for summary judgment is whether the Aqueduct Buffet was an "operating unit" under the federal WARN Act and the N.Y. WARN Act.  The Court agrees with Resorts World that the Aqueduct Buffet was not an operating unit.[3]

---

[3]  Because the Court agrees with Resorts World that the Aqueduct Buffet was not an operating unit, the Court need not address Resorts World's alternative arguments as to waiver or estoppel.  Def.'s Mem. of Law at 19–24.  Moreover, the Court rejects plaintiffs' alternative argument that the Aqueduct Buffet was a single site of employment.  *See* Pls.' Mem. of Law at 6–7.

A. <u>The Aqueduct Buffet was not operationally separate and distinct.</u>

The record evidence in this case—including the CBA, the deposition transcript of Robert Netter, and the deposition transcript and affidavit of Ryan Eller—show that there is no genuine issue of fact that the Aqueduct Buffet was not operationally separate and distinct from the rest of the casino.  Def.'s Mem. of Law at 8–10; *see* CBA, Dkt. 63-10; Job Descriptions, Dkt. 63-13; *see also* Netter Dep. Tr., Dkt. 62-4; Eller Dep. Tr. Dkt. 62-9, 62-10, 62-11; Eller Aff., Dkt. 63.[4]  As Resorts World points out, the CBA does not identify the Aqueduct Buffet, or any other food outlet, as a separate department, division, or unit in the casino.  Rather, the CBA sets forth the same job descriptions, salary and benefit structure, policies, and terms of employment for cooks, food servers, food runners, bussers, hosts, cashiers, stewards, and warehouse attendants, regardless of the food outlet.  Many of these workers rotated among the various food outlets in the casino.  Indeed, Mr. Netter testified during his deposition that stewards, who were responsible for cleaning and maintaining the entire facility, reported to the same shift manager on a given shift and regularly rotated throughout the facility pursuant to a schedule.  Netter Dep. Tr. at 39:3–41:9, 95:4-14; *see* Eller Aff. ¶ 19.  Mr. Netter further testified that all sous chefs used the same culinary manual, "no matter where [they] work[ed]" in the building, and that sous chefs, along with managers, would fill in at other food outlets as needed, such as when there were call-outs during a particular shift.  Netter Dep. Tr. at 24:7-14, 26:2-19, 50:12–52:14.  As for executive sous chefs, Mr. Netter testified that they managed the kitchens, "help[ing] each other everywhere . . . . rotating all day long, walking through different kitchens."  Netter Dep. Tr. at 81:22–82:25.  Moreover, Mr. Netter testified that cashiers, servers, and culinary staff would fill in, as needed, at the other buffet located

---

[4]  At the time the briefs were submitted in 2016, Robert Netter was the vice president of Food and Beverage at Resorts World and Ryan Eller was the president of Resorts World.

in the facility and could sign up to work at special events that took place throughout the facility. Netter Dep. Tr. at 118:16–119:4, 119:11-24, 121:21–122:5.

Resorts World also submits the deposition transcripts of plaintiffs Radika Kanhai, Eric Lee, and Christopher McLeod as evidence that the Aqueduct Buffet was not operationally separate and distinct.  Kanhai Dep. Tr., 62-5; Lee Dep. Tr., Dkt. 62-6; McLeod Dep. Tr., Dkt. 62-7.  For example, Mr. Lee testified that he had applied for a position in the Food and Beverage Department of Resorts World and did not know which food outlet he would be assigned to until his start date. Lee Dep. Tr. at 16:5–17:3.  He further testified that, after he began working at the Aqueduct Buffet, he was sometimes assigned to work in different food outlets depending on need.  Lee Dep. Tr. at 41:22–43:6.

Next, the evidence shows that the Aqueduct Buffet was dependent on the casino's centralized services.  According to Mr. Netter and Mr. Eller, employees working in the cold kitchen, known in the industry as the "Garde Manger," prepared and delivered vegetables, salads, cold cuts, sushi, and pizza dough to all of the food outlets, including the Aqueduct Buffet.  Eller Aff. ¶ 16; Netter Dep. Tr. at 55:8–59:22.  Indeed, Mr. Eller emphasized, "the Aqueduct Buffet did not function without the Garde Manger."  Eller Aff. ¶ 16.  Additionally, common recipes were used across all food and beverage outlets and many similar or identical items were available across several outlets. Eller Aff. ¶ 23; Netter Dep. Tr. at 134:17–136:8.  For example, the pizza available at the Aqueduct Buffet was the same as the pizza offered at another food outlet.  Netter Dep. Tr. at 142:2-5.

The Aqueduct Buffet also did not purchase its own food; rather, food was purchased through Resorts World's central purchasing department and was stored in a centralized warehouse. Eller Aff. ¶¶ 17–18; Netter Dep. Tr. at 20:25–22:4, 22:22–23:2.  Mr. Eller explained that "[t]he

10

Purchasing department acted as the centralized purchasing unit for everything needed to operate Resorts World (not just food items), from paper clips, to furniture, to butter" and that "[t]he employees in the Purchasing department determined what items were needed for the entire facility and set re-ordering levels for those items."  Eller Aff. ¶ 17.  Personnel in all areas of the casino "requested stored items through Resorts World's central Ariba System, and Warehouse personnel would deliver such items, as needed."  Eller Aff. ¶ 18.  Mr. Eller also explained that the Aqueduct Buffet relied on centralized services from the Environmental Services Department, marketing, human resources, legal, and payroll.  Eller Aff. ¶¶ 20–21.  Marketing efforts, for example, included providing coupons to patrons for any of the food outlets or for one specific food outlet when they spent a certain amount of money in the casino.  Eller Aff. ¶ 21; Netter Dep. Tr. at 140:3-23.

Plaintiffs, relying on the same or similar evidence as Resorts World, emphasize that the Aqueduct Buffet *was* operationally separate and distinct because (1) it was physically separate from the other food venues, as it had its own seating area and customers were required to enter through a cashier line and pay prior to entry; (2) it was advertised as a separate experience; and (3) it offered different products and services from the other venues.  Pls.' Mem. of Law at 6; Pls.' Mem. in Opp. to Def.'s Mot. for Summ. J. ("Pls.' Mem. in Opp.") at 4, Dkt. 67; *see* Netter Dep. Tr. at 12:7–14:3, 140:24–144:21, 147:12–148:25; Advertisements, Dkt. 54-7, 54-8, 54-9, 54-10; Def.'s Response to Pls.' Requests for Admission at 3, Dkt. 54-2 ("Response to Request No. 3 . . . Without waiving the foregoing objection and subject thereto, as well as the General Objections set forth above, Defendant admits that the buffet had its own seating area . . .").  Plaintiffs further point out, among other things, that the Aqueduct Buffet had its own schedule and employees who worked there regularly, absent a special circumstance; most of its food items were prepared in its own kitchen; the costs of labor and a majority of the food costs were recorded and attributed to the

Aqueduct Buffet using a cost center; and its employees had uniforms that were distinct from those used at other food venues.  Netter Dep. Tr. at 53:22–55:25, 72:2–73:23, 121:6-20, 131:13–133-2, 145:8-25; Eller Dep. Tr. at 84:11–85:2.  However, as Resorts World argues, *see* Def.'s Reply at 5–6, Dkt. 71, some of these allegations are misleading and/or unsupported by the record.  For example, although plaintiffs assert that the Aqueduct Buffet was physically separate from the rest of the casino, it should be noted that it was "open air" and not walled-off.  Netter Dep. Tr. at 147:15-23.  As for cost centers, Mr. Eller emphasized that "Resorts World did not prepare financial statements that included all of the operating expenses, including allocations of shared costs, for the Aqueduct Buffet" and that Resorts World instead had "a centralized accounting and finance department which record[ed] and report[ed] financial information for direct costs incurred in the Food and Beverage department on an overall summary basis."  Eller Aff. ¶ 33.  Furthermore, the uniforms worn by employees working in the Aqueduct Buffet were not entirely distinct.  Cooks, stewards, and hosts wore the same uniform across all the food venues, and servers, bus persons, and cashiers wore the same uniform used in the other buffet.  Netter Dep. Tr. at 131:19–132:19.

Moreover, plaintiffs' proffered facts fail to dispute the CBA's provisions with respect to common job descriptions, training, hiring practices, and policies for all non-managerial employees. Plaintiffs argue that no legal authority supports the conclusion that these provisions "would be dispositive" on the issue of whether the Aqueduct Buffet was a separate and distinct unit.  Pls.' Mem. in Opp. at 5.  However, Resorts World never argued that the CBA is dispositive, but that it is a "[s]ource[] of evidence [that] assists in defining separate and distinct units."  Def.'s Reply at 2 (quoting 54 Fed. Reg. 16050)  Plaintiffs' proffered facts also fail to dispute the evidence that the Aqueduct Buffet was dependent on Resorts World's centralized services for, among other things, recipes, ingredients, supplies, storage, cleaning, human resources, legal issues, payroll, and

insurance and accounts payable.  The Court rejects plaintiffs' argument that "there is absolutely no legal authority" that centralized services affect the definition of an operating unit.  Pls.' Mem. in Opp. at 6.  The DOL clearly stated that "[t]he critical factor in determining what constitutes an operating unit will be the organizational or operational structure of the single site of employment." 54 Fed. Reg. 16050.  Therefore, the facts proffered by Resorts World with respect to centralized services are not only relevant but critical to the determination of whether the Aqueduct Buffet was a separate and distinct unit.

B.  The Aqueduct Buffet was not organizationally separate and distinct.

The record evidence shows that there is no genuine issue of fact that the Aqueduct Buffet was not organizationally separate and distinct.  Resorts World relies upon organizational charts to show that the Food and Beverage Department had a common management structure that included all of the food outlets.  Def.'s Mem. of Law at 12–13; *see* Eller Aff. ¶¶ 25–26; Organizational Charts, Dkt. 63-1; Malmlund Expert Report at 11, Dkt. 62-3.  In particular, the charts show that *all* food outlets, including the Aqueduct Buffet, were managed by the Executive Chef and Assistant Director of the Food and Beverage Department.  *See* Organizational Charts.  The Executive Chef and Assistant Director both reported to the Director of Food and Beverage, who, in turn, reported to the Vice President of Food and Beverage.  *Id.*  The Vice President then reported to the Chief Operating Officer of Resorts World, who, in turn, reported to the President of Resorts World. Malmlund Expert Report at 11.  Mr. Netter specifically testified that the Executive Chef oversaw all the food outlets and determined what food would be served at each outlet.  Netter. Dep. Tr. at 74:3-10.

Plaintiffs, however, argue that the Aqueduct Buffet had its own manager and shift managers, which supports the finding that the Aqueduct Buffet was an operating unit.  Pls. Mem.

of Law at 6; Pls.' Mem. in Opp. at 7; *see* Netter Dep. Tr. at 23:9-19.  In making this argument, plaintiffs rely on *Pavao v. Brown & Sharpe Mfg. Co.*, 844 F. Supp. 890 (D.R.I. 1994).  In that case, the district court held that the Consolidated Parts Department, as part of the Company's Measuring Systems Division, was an operating unit within the meaning of the WARN Act because it "had its own managers, its own separate budget (along with a separate 'cost center' accounting number), and its own separate workforce." *Pavao*, 844 F. Supp. at 895.  Here, on the other hand, the record evidence demonstrates the Food and Beverage Department had a *centralized* management structure, in which the Executive Chef and Assistant Director oversaw all the food outlets, the executive sous chefs rotated among all the kitchens, stewards reported to one manager who oversaw all the outlets, and managers would fill in at different food outlets, as needed.  Eller Aff. ¶ 26; *see* Organizational Charts; Netter Dep. Tr. at 81:22–82:25, 95:4-14.  There was also a single beverage manager, who ordered "all the beverage that comes into the central warehouse for distribution to all outlets."  Netter Dep. Tr. at 92:7-9.  Finally, as stated above, Resorts World did not track all costs associated with the Aqueduct Buffet, and many workers rotated among the various food outlets, either regularly or as needed.  Eller Aff. ¶¶ 26, 33.

C. <u>The Office of the Impartial Chairperson determined in November 2015 that the Aqueduct Buffet was not a separate and distinct department for the purpose of classification seniority.</u>

In addition to the evidence described above, Resorts World relies upon a November 2015 decision by the Office of the Impartial Chairperson to support its argument that the Aqueduct Buffet was not an operating unit.  Def.'s Mem. of Law at 13–15; *see* Impartial Chairperson Dec. dated Nov. 24, 2015, Dkt. 62-8.[5]

---

[5]  The Office of the Impartial Chairperson is the same arbitrator who issued the Interest Arbitration Award in October 2013.

As set forth in the decision, the Union had filed two grievances, seeking a "make whole remedy for [Resorts World's] failure to apply classification seniority throughout its food and beverage operations in effectuating the layoffs" on January 6, 2014 in relation to the closure of the Aqueduct Buffet and for Resorts World's failure "to properly classify Bus Persons to enable them to share in tips." Impartial Chairperson Dec. at 2 (internal quotation marks omitted). The Union argued that, pursuant to the CBA, certain employees laid off on January 6 should have been entitled to "bump" a less senior employee in the same job classification working for the Food and Beverage Department. *Id.* at 11. Instead, the Union argued, Resorts World improperly "laid off all the [Food and Beverage] employees who worked in the Buffet, including Host/Hostesses and Servers who had more classification seniority than Host/Hostesses and Servers" who worked in other food outlets within the casino, such as RW Prime and Genting Palace. *Id.* The Union asserted that each food outlet was not a separate department for the purposes of classification seniority because

> [a]ll outlet managers reported to the [Food and Beverage ("F&B")] Director. Each newly hired F&B employee received the same initial customer service training and were subject to the same policies and procedures regardless of which outlet they worked in. Buffet Host/Hostesses and Servers were also paid the same rate of pay as Host/Hostesses and Servers who worked in the other F&B outlets.

*Id.* The Union further asserted that hosts and servers working the buffet rotated among the food outlets as needed and performed similar job duties as those who worked in other food outlets. *Id.* at 9–10.

The Office of the Impartial Chairperson agreed with the Union that Resorts World operated a centralized Food and Beverage Department. *Id.* at 17. Specifically, the Impartial Chairperson found that "the term 'department' means a 'food and beverage department'" and that "where jobs from one outlet to another are, in the overwhelming main, vastly similar or fungible so as to require little or no training, classification seniority must be given effect." *Id.* Thus, the Impartial

Chairperson held, "a more senior buffet host may bump a host in another outlet" because all food outlets operated under the same Food and Beverage Department.  *Id.*

Plaintiffs argue that Resorts World's "attempts to equate an arbitrator's determination that the word 'department' in the [CBA] is the same as the term 'operating unit' in the WARN Act and NY WARN Act fail[] entirely because they are comparing two different terms used in different contexts." Pls.' Mem. in Opp. at 7.  Resorts World, in turn, argues that the Impartial Chairperson's factual finding that the Aqueduct Buffet was not a separate and distinct department "should be given great deference." Def.'s Mem. of Law at 15.  In making this argument, Resorts World cites to a number of cases in which the court, in its review of an arbitration award, was required to grant deference to the arbitration panel's decision.  *See, e.g.*, *Wallace v. Buttar*, 378 F.3d 182, 189 (2d Cir. 2004); *Westerbeke Corp. v. Daihatsu Motor Co.*, 304 F.3d 200, 208 (2d Cir. 2002).

Here, however, the Court has not been asked to review or vacate the November 2015 decision.  The decision, at most, represents persuasive authority.  The Court considers it as much, particularly since the Impartial Chairperson relied on many of the same factual considerations in making his determination that are relevant to the analysis in this case.  Moreover, in any event, the record evidence described in the above sections is sufficient on its own to show that the Aqueduct Buffet was not an operating unit.

D. Resorts World's expert opines that the Aqueduct Buffet was not an operating unit according to accepted business practices.

Finally, Resorts World proffers the expert opinion of Bjorn Malmlund, a partner in the Fraud Investigation and Dispute Services Practice at Ernst & Young LLP, to support its argument that the Aqueduct Buffet is not an operating unit according to accepted business practices.  Def.'s Mem. of Law at 15–18; *see* Malmlund Expert Report.  Plaintiffs, in turn, argue that the Court should reject Mr. Malmlund's expert report because (1) this is the first time Mr. Malmlund has

16

ever offered his opinion on the definition of an "operating unit" under the WARN Act; (2) Mr. Malmlund's opinion is not based on reliable principles and methods; and (3) the report is unsworn. Pls.' Mem. in Opp. at 8–10.

Under Rule 702 of the Federal Rules of Evidence, an expert witness, unlike a lay witness, is "permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 (1993). "Under *Daubert*, the district court functions as the gatekeeper for expert testimony, whether proffered at trial or in connection with a motion for summary judgment." *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008) (internal quotations marks and citations omitted). A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if it: (1) will assist the trier of fact to understand the evidence or determine a fact in issue; (2) is based on sufficient facts or data; (3) is the product of reliable principles and methods; and (4) is the product of a reliable application of the expert's principles and methods to the facts of the case. *See* Fed. R. Evid. 702. "The proponent of the expert testimony bears the burden of establishing the admissibility of such testimony under the *Daubert* framework by a preponderance of the evidence." *Bee v. Novartis Pharm. Corp.*, 18 F. Supp. 3d 268, 299–300 (E.D.N.Y. 2014).

"To gauge the reliability of proffered testimony, 'the district court should consider the indicia of reliability identified in Rule 702,' which are not exhaustive." *United States v Raniere*, 2019 WL 2212639, at *5 (E.D.N.Y May 22, 2019) (quoting *Wills v. Amerada Hess Corp.*, 379 F.3d 32, 48 (2d Cir. 2004)). The court may also consider four additional factors identified in *Daubert*, including: (1) whether the expert's technique or theory can be or has been tested; (2) whether it has been subjected to peer review and publication; (3) whether there is a high error rate

for the expert's technique, and whether there are "standards controlling the technique's operation"; and (4) whether the expert's technique or theory is generally accepted by the relevant scientific community. *Daubert*, 509 U.S. at 592–94. The "court's inquiry into the reliability of expert testimony is 'flexible,'" and the *Daubert* factors are not dispositive. *Raniere*, 2019 WL 2212639, at *5 (quoting *Daubert*, 509 U.S. at 593–94). Indeed, the Supreme Court clarified in a later case that the *Daubert* factors do not apply neatly to all expert evidence, especially evidence that is not of the scientific nature found in *Daubert*. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147–49 (1999). Likewise, "[t]he Second Circuit's standard for admissibility of expert testimony is especially broad." *United States v. Herron*, 2014 WL 1871909, at *6 (E.D.N.Y. May 8, 2014) (internal quotation marks and citation omitted).

An expert can provide reliable testimony by, among other things, "citing to reports, providing in-depth analysis of the facts, providing peer reviewed data, and explaining the basis for [their] conclusions." *Fuentes v. Scag Power Equip. - Div. of Metalcraft of Mayville, Inc.*, No. 17-CV-825 (DRH)(AKT), 2019 WL 3804735, at *5 (E.D.N.Y. Aug. 13, 2019), *appeal dismissed* (Dec. 27, 2019). "An otherwise well-credentialed expert's opinion may be subject to disqualification if [they] fail[] to employ investigative techniques or cannot explain the technical basis for [their] opinion." *Dreyer v. Ryder Auto. Carrier Grp., Inc.*, 367 F. Supp. 2d 413, 416–17 (W.D.N.Y. 2005).

Here, Mr. Malmlund admits that this is the first time he has offered his opinion on the definition of an operating unit under the WARN Act. Malmlund Dep. Tr. at 50:6-15, Dkt. 70-2. Nevertheless, the report states Mr. Malmlund is a Certified Public Accountant and is certified in financial forensics and accredited in business valuation by the American Institute of Certified Public Accountants. Malmlund Expert Report at 2. He has "over 27 years of experience providing

accounting and auditing services, and assisting companies with complex accounting, economic, financial and dispute-related issues." *Id.* "[W]here an expert possesses qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent." *Hilaire v. DeWalt Indus. Tool Co.*, 54 F. Supp. 3d 223, 236 (E.D.N.Y. 2014) (internal quotation marks and citation omitted). Having considered Mr. Malmlund's qualifications, the Court finds that it is not necessary that he have prior experience in cases involving the WARN Act in order to opine on the definition of an operating unit. The Court thus concludes that he is qualified to testify in this case.

As for the reliability of Mr. Malmlund's methodology, the Court notes that Mr. Malmlund, after reciting the DOL's definition of an "operating unit" for purposes of the WARN Act, listed the following three dictionary definitions of an "operating unit" that are commonly used and generally accepted from an accounting/operational perspective:

> A subsidiary that engages in business with other parties. That is, an operating unit has its own assets and liabilities and functions as if it were an independent company; the only difference is that it is owned by another company. An operating unit is useful for the profit it can produce.
>
> A subsidiary of a corporation that operates as if it were an independent company. An operating unit has its own assets and liabilities and its own management structure.
>
> [A] [s]ubsidiary of any corporation that is run like an independent company. An operating unit has its own structures, assets and liabilities, distinct from those of the parent corporation.

Malmlund Expert Report at 8.[6] Thereafter, based on his knowledge and experience, he listed a number of factors that are typically considered in the determination of an operationally or

---

[6] These three definitions were taken from the Farlex Financial Dictionary, BusinessDictionary.com, and Black's Law Dictionary, respectively.

financially independent operating unit according to business evaluation and accounting practices. *Id.* at 8–9.  He did not define the terms "product," "operation," or "specific work function" as used in the regulations.  Malmlund Dep. Tr. at 69:4–70:12.  He testified during his deposition that he did not know whether there was a specific definition of "operating unit" used by accountants, but that accountants frequently must review information on operating units for financial reporting purposes.  Malmlund Dep. Tr. at 82:17–84:12, 120:14–121:11.  He further testified that he did not believe there was any other authority, textbook, or regular accounting practice that he could have used to assist him in his analysis.  Malmlund Dep. Tr. at 122:25–123:24.

In short, Mr. Malmlund relied on his knowledge and over 27 years of experience in accounting in his analysis of whether the Aqueduct Buffet was an operating unit.  Malmlund Dep. Tr. at 114:14–115:21.  Although he did not set forth definitions for certain terms or explain specifically how he came up with the factors that he listed, it is clear, based on Exhibit B to the report and his deposition testimony, that he heavily relied on his review of the record evidence, interviews with various Resorts World employees, and a tour of the facility in coming to his conclusions.  *See* Exhibit B to Malmlund Expert Report.  The Court finds that Mr. Malmlund's report is not, as plaintiffs assert, too unreliable to be considered.  Accordingly, the Court will consider this report in support of Resorts World's argument that the Aqueduct Buffet is not an operating unit.[7]

---

[7] Plaintiffs also argue that Mr. Malmlund's expert report must be excluded because it is unsworn.  "Courts in this Circuit have uniformly held that unsworn expert reports do not satisfy the admissibility requirements of Fed. R. Civ. P. 56(e), and cannot be used to defeat a summary judgment motion without additional affidavit support."  *Berk v. St. Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d 334, 352 (S.D.N.Y. 2005).  Here, because Mr. Malmlund submitted an affidavit and was deposed about his qualifications and the substance of his report, *see* Malmlund Aff., Dkt. 70; Malmlund Expert Report, Dkt. 70-2, the Court does not reject the expert report on the basis that it is unsworn.  *See Philadelphia Indem. Ins. Co. v. Streb, Inc.*, No. 19-CV-366 (KPF), 2020 WL 5549316, at *4 n.4 (S.D.N.Y. Sept. 16, 2020).

**CONCLUSION**

Based on its review of the pleadings and the record evidence described above, the Court concludes Resorts World has sufficiently proven that the Aqueduct Buffet was not an operating unit under the federal WARN Act and N.Y. WARN Act.  Plaintiffs have failed to come forward with specific facts showing that there is a genuine issue for trial.  Therefore, plaintiffs' motion for summary judgment is DENIED and Resorts World's cross motion for summary judgment is GRANTED, dismissing the Amended Complaint.  The Clerk of the Court is directed to enter judgment and close the case.

SO ORDERED.

_____
  /s/
I. Leo Glasser, U.S.D.J.

Brooklyn, New York
March 12, 2021